NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

File Name: 17a0600n.06

Case No. 15-5997

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Oct 31, 2017
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| BARBARA LANG, | ) | DISTRICT OF TENNESSEE |
| | ) | |
| Defendant-Appellant. | ) | **OPINION** |

BEFORE: KEITH, ROGERS, and McKEAGUE, Circuit Judges.

**McKEAGUE, Circuit Judge.** This is a criminal appeal following a lengthy trial. A federal jury convicted Barbara Lang of running a "pill mill" in Tennessee and structuring cash deposits to avoid U.S. Treasury reporting requirements. She appeals on a host of evidentiary, constitutional, and sentencing issues. We **AFFIRM**.

**I**

After a twenty-six-day trial, a federal jury convicted Lang on twenty-one counts of federal drug and money-laundering charges. The district court imposed a 280-year sentence. Specifically, Lang was convicted under three separate statutes:

- Conspiring to distribute controlled substances (two counts), 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(C), (b)(2);

- Maintaining drug-involved premises (five counts), 21 U.S.C. § 856(a)(1);

- Structuring cash deposits to evade reporting requirements (fourteen counts), 31 U.S.C. §§ 5313(a), 5324.

The jury acquitted Lang on one drug-involved-premises count and seven structuring counts. After the government rested, the court, on Lang's motion, entered a judgment of acquittal on a charge of obstructing the due administration of the Internal Revenue Code. 26 U.S.C. § 7212(a).

Lang and her daughter (Faith Blake) operated a pain clinic called Superior One ("Superior") in Tennessee. The clinic employed one medical director (a licensed doctor), several nurse practitioners, and other para-physician staff members. Neither Lang nor Blake was a medical professional; instead, their ostensible role was to manage the clinic's non-medical affairs. Lang, for example, led the clinic's Bible studies.

The U.S. Drug Enforcement Agency ("DEA") eventually suspected that Superior was a "pill mill," which is a clinic that dispenses drugs with no legitimate purpose. The evidence supporting this suspicion was substantial. At all hours of the day, the line to enter Superior was long, and patients frequently waited all day to get an appointment. Nearly all of the people who observed the clinic's patients—neighbors, city officials, other patients, and employees alike—were convinced that most of Superior's patients were drug addicts. For example, witnesses observed many patients with "track marks" on their arms and patients who were "strung out," "zombified," and "out of it." One witness testified that the scene reminded him of a drug house.

Through surveillance and investigation, the DEA confirmed its suspicion. It obtained wiretaps for Lang's cell phone, where agents recorded conversations between Lang and a well-known drug dealer, John Goss. In these conversations, Lang invited Goss to bring his buyers to her clinic, and Goss routinely asked Lang to let his clients skip the line. Lang was well-aware that Goss was an active drug dealer. An undercover agent (Mark Delaney) posed as a patient and was eventually able to obtain access to a provider at the clinic who gave him excessive pain medication without much examination and without viewing any medical records. Several other

employees of the clinic, concerned about the activity there, passed along information to the DEA. The DEA was also informed that, on at least one occasion, Blake ordered a doctor to prescribe pain medication to a patient even though the patient did not need it.

Blake, however, eventually started illegally obtaining pain medication for herself. This caused her attendance at the clinic to lapse, and Lang stepped in to fill the void, sometimes seeing patients on her own, even though she had no medical training. Lang eventually discovered that Blake was giving drugs to her twelve-year-old child—Lang's grandson. This fact sparked a fight between the two women that eventually led to the resignation of the medical director and the closure of Superior for good.

After Superior closed, the two women formed their own medical clinics. Lang's clinic was named Primary Care ("Primary"), and Blake's clinic was named Elite Care ("Elite"). Lang retained many of the patients who previously attended Superior, and some of the medical staff followed her there as well. Lang made some attempts to run Primary legally, but it still suffered from many of the same issues. For example, soon after Primary opened, Lang called Goss and suggested that he start bringing his customers to her clinic. Lang also ordered her physicians to issue prescriptions, even when the doctors did not think the prescriptions were warranted.

These issues led the DEA to continue investigating Lang and Primary. Eventually, the DEA raided Primary, Elite, and Lang's home. The evidence gathered during the government's investigation and surveillance was eventually used to indict Lang, Blake, and several other members of the clinics' staff on federal drug and money-laundering charges. During trial preparation, the government turned over a sample of the clinics' paper medical records to their expert witness, Dr. Kloth, who concluded that the overwhelming majority of the prescriptions issued to these patients lacked a legitimate medical purpose.

The government presented substantial evidence to the jury. To make its case, the government called several codefendants who had pled guilty under a cooperation agreement, its expert witnesses, the clinic's neighbors, several patients who had been addicted to the pain medication prescribed by the clinic, and the law enforcement agents involved in the investigation. Lang defended by insisting that the prescriptions were legitimate and that she had no knowledge of any illegality occurring at either clinic. The jury convicted her on twenty-one of the twenty-nine counts remaining at the close of the proofs.

At sentencing, the court found Lang's base offense level to be 38. After enhancement, her offense level was set at 43, carrying a recommended sentence of 3,360 months' imprisonment—an effective life sentence. Lang spoke for over an hour in a plea for mercy, asserting that she never meant to break the law and presenting many characters from the Bible and U.S. history as her life inspirations. The district judge, unimpressed, sentenced Lang according to the Guidelines. The court reasoned that the need for general deterrence and retributive punishment were compelling, considering the size of the conspiracy, the prescription drug epidemic, and Lang's refusal to acknowledge her own culpability.

This appeal followed. Additional facts are supplied in the analysis when necessary.

## II

Lang appeals her conviction on six grounds: (A) the district court erroneously admitted evidence of her financial misdeeds through an IRS Agent; (B) the district court improperly admitted the testimony of the government's medical expert; (C) the district court improperly admitted evidence of an overdose death, news articles about investigations of other medical clinics, and a chronology found in her desk; (D) the district court improperly denied her Fourth Amendment motion to suppress; (E) the trial resulted in cumulative error; and (F) the

government presented insufficient evidence to sustain her drug convictions. She also argues that the district court imposed an unlawful sentence. None of these arguments have merit.

**A**

Lang's first argument revolves around an IRS Agent's testimony that the government offered in pursuit of an obstruction charge in the indictment (Count 91). *See* 26 U.S.C. § 7212(a) (obstructing the due administration of the Internal Revenue Code (IRC)). She contends that Count 91 was defective as charged, and should have been dismissed during pretrial motion hearings. The district court found before trial that the count was properly charged, but entered a judgment of acquittal after the government's case for lack of evidence.

Since Lang was not convicted on the obstruction count, she can only win if she can show some other prejudice from the court's refusal to dismiss the count before trial. Her appeal therefore focuses on the relevancy of the IRS Agent's testimony. This agent (Don Lemons) testified about Lang's financial misdeeds during the government's case-in-chief. Lang argues that the admission of this testimony requires us to grant her a new trial. Her theory involves two steps. First, Agent Lemons's testimony was unfairly prejudicial and was only relevant to the obstruction charge. Thus, it would have been excluded if the court had granted her motion to dismiss Count 91 before Agent Lemons testified. Second, the indictment on Count 91 was legally defective—and therefore should have been dismissed—because it did not allege knowledge of a discrete, official IRS action. Because Lang's arguments fail on the first issue, we do not reach the second.

**1**

The government responds to Lang's arguments by saying that Agent Lemons's testimony was relevant to other charges in the indictment, not just Count 91. The government is mostly correct. Even where it is wrong, any error was harmless.

Generally, we review evidentiary rulings on relevance and unfair prejudice for an abuse of discretion. *United States v. Jackson-Randolph*, 282 F.3d 369, 375 (6th Cir. 2002). We review unpreserved evidentiary objections for plain error. *United States v. Kelly*, 204 F.3d 652 (6th Cir. 2000); Fed. R. Evid. 103. If counsel raises objections in a motion *in limine* but the court defers its ruling or makes its decision "in any way qualified or conditional," then "the burden is on counsel to raise objection [at trial] to preserve error." *United States v. Poulsen*, 655 F.3d 492, 510 (6th Cir. 2011) (quoting *United States v. Brawner*, 173 F.3d 966, 970 (6th Cir. 1999)).

The bulk of Lang's pretrial motions focused on her objections to the indictment. However, at the end of Lang's supplemental brief and during oral argument on the motion, Lang's counsel protested that the testimony would be irrelevant and unfairly prejudicial—clear allusions to Rules 401 and 403 of the Federal Rules of Evidence. The court indicated it would file a written ruling on the motions. But nowhere in the court's memorandum and order did it consider whether the evidence would be relevant to other counts in the indictment if the court dismissed Count 91 at a later time.

Thus, Lang's counsel bore the burden of reminding the court at trial that she would object on relevance or undue prejudice grounds if Count 91 were dismissed. This is particularly true in a twenty-six-day jury trial where the district judge cannot possibly be expected to remember every nuance of the parties' arguments. Nowhere during Agent Lemons's testimony did Lang's

counsel object on these grounds and give the district court the opportunity to consider that objection. We therefore find this argument to be forfeited, and we apply plain-error review.

**2**

There was no plain error in admitting the agent's testimony. A district court commits plain error in admitting evidence only if: (1) it commits an error; (2) the error is obvious; (3) the error affects substantial rights; and (4) the error "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Demjanjuk*, 367 F.3d 623, 629 (6th Cir. 2004) (quoting *Johnson v. United States*, 520 U.S. 461, 466–67 (1997)).

Agent Lemons's testimony was mostly relevant. Under Rule 401, evidence is relevant "if it has any tendency to make a fact more or less probable than it would be without the evidence," and if "the fact is of consequence in determining the action." Fed. R. Evid. 401. This threshold is low, and evidence is relevant if it "advance[s] the ball" one inch. *Dortch v. Fowler*, 588 F.3d 396, 401 (6th Cir. 2009). Evidence of financial irregularities has long been admissible in white-collar crime and narcotics prosecutions to show the defendant's intent, knowledge, motive, or to explain the source of income. *Jackson-Randolph*, 282 F.3d at 377.

Here, Lang's relevance objections focus primarily on two subjects. First, she argues that her failure to file tax returns and underreporting of income was not relevant to any issue except Count 91. But Lang's main defense was (and is) that Primary was a legitimate business. The failure to file tax returns or the underreporting of income casts some doubt on that contention, which is all Rule 401 requires. *See Jackson-Randolph*, 282 F.3d at 377; *United States v. Martinez*, 430 F.3d 317, 335 (6th Cir. 2005) (holding testimony admissible to rebut defense characterization of the evidence).

Furthermore, this evidence was relevant to the structuring charges. Lang's failure to file tax returns for an entity also tends to prove that her motive in structuring the same entity's cash deposits was unlawful. *See, e.g.*, *United States v. Abboud*, 438 F.3d 554, 581–82 (6th Cir. 2006). This is particularly true considering Agent Lemons's statement that the IRS often collaborates with other federal agencies (such as the U.S. Treasury and the DEA) while investigating crimes. In other words, financial irregularities or drug activity may alert the IRS to potential tax violations, and vice versa. A savvy criminal, eager to avoid detection by both the DEA and the IRS, might intentionally structure his or her financial matters to avoid triggering these bureaucratic "trip wires." There was no plain error in finding that this evidence was relevant.

Second, Lang objects to the testimony that she may have embezzled or "skimmed" cash from her employer before depositing it. However, this evidence was relevant to the structuring charges, because it had some tendency to show willfulness and dishonest intent in structuring the deposits. *See, e.g.*, *Abboud*, 438 F.3d at 581–82 (paying employees under the table admissible to prove lack of mistake or accident in prosecution for willful violation of tax laws). It also would be admissible to show Lang's control over the funds and her opportunity to commit the structuring offenses. *See United States v. Jobson*, 102 F.3d 214, 221 (6th Cir. 1996) (holding gang membership admissible to show access to unlawful firearms or opportunity to commit the charged offense). Additionally, we have held that uncharged financial misconduct that is "inextricably intertwined" with the charged conduct may be admitted as "evidence of a single criminal episode." *United States v. Aldridge*, 455 F. App'x 589, 594 (6th Cir. 2012); *United States v. Tarwater*, 308 F.3d 494, 516–17 (6th Cir. 2002).

Here, Lang allegedly skimmed cash from the very deposits she was accused of structuring. This evidence was therefore relevant to explain the disparity between the clinics'

income and the amounts Lang deposited. This fact also has a tendency to show that Lang was, indeed, not running a lawful business—a fact which undermined Lang's primary defense. A cash-only business is generally lawful, but the lack of electronic accounting mechanisms makes it necessary to keep accurate cash-flow records. An owner's *deliberate* attempts to hide the amount of cash flowing into her business generates enough suspicion of illicit behavior to satisfy Rule 401. There was no plain error in finding that this testimony was relevant.[1]

Alternatively, Lang contends this evidence was unfairly prejudicial under Rule 403. "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . ." Fed. R. Evid. 403. The district judge has broad discretion in ruling on unfair-prejudice objections, but the standard is even more deferential here because the trial court was not afforded the opportunity to consider the objection. *Demjanjuk*, 367 F.3d at 629. Even then, the cards are stacked in favor of admissibility—only when the risk of prejudice is both *unfair* and *substantially weightier* than any probative value does the court have discretion to exclude the evidence. Fed. R. Evid. 403.

Here, the evidence of Lang's failure to file tax returns and skimming cash was certainly prejudicial. But the record does not show that this prejudice was *plainly unfair*, as contemplated by Rule 403 and as required by the plain-error standard. Perhaps it would be different if a financial crime was entirely collateral to the charged offenses. *See Old Chief v. United States*, 519 U.S. 172, 174 (1997). But both pieces of evidence have substantial probative force here, and any unfair prejudice that resulted from their admission is simply not enough to require reversal.

---

[1] Lang's counsel contended at argument that the testimony was only evidence of general criminal intent, not the specific criminal intent required by the statutes. Although this distinction is critical in determining what the government must prove, *United States v. Odeh*, 815 F.3d 968 (6th Cir. 2016), it has far less importance in deciding issues of relevance. A fact need not carry the party's entire case to be relevant. *Dortch*, 588 F.3d at 401. Proof of general criminal intent has some tendency to prove specific intent to commit the charged crime, although it cannot sustain a conviction by itself. On plain-error review, Lang has not shown that this evidence was so far outside the realm of relevance that there was a fundamental miscarriage of justice.

**3**

The last part of Agent Lemons's testimony, however, was relevant only to the obstruction count. But any error was harmless. Error in admitting testimony is harmless "unless it is more probable than not that the error materially affected the verdict." *United States v. Pritchett*, 749 F.3d 417, 432–33 (6th Cir. 2014) (quoting *United States v. Clay*, 667 F.3d 689, 700 (6th Cir. 2012)). Thus, admitting irrelevant or prejudicial testimony is harmless if other factors provide "fair assurance" that the conviction was not influenced by the error. *Id.*

Towards the end of his testimony, Agent Lemons testified about the impact Lang's actions had on the IRS. When asked whether he was able to reconstruct how much tax Superior and Lang owed to the IRS, the following exchange ensued:

> [Agt. Lemons]: No. There wasn't enough records, enough documents of any kind, to determine how much was—how much was brought in, how much was paid out, expenses, how much was paid to the employees. We just had no way to determine those figures.
>
> [AUSA]: And what effect did that have on your ability to collect taxes and to hold people responsible under federal law for the income taxes they owe?
>
> [Agt. Lemons]: It really kind—it really shuts us down, because, like we had talked about at the very beginning, the whole system is voluntary, it depends on each one of us reporting—including the businesses, reporting how much they pay everybody, and then it's dependent upon us as taxpayers to file our own tax return and pay that. But if we don't have any records or any way to track that, especially from the employer's side, we just have no way to determine that.

Unlike his earlier testimony, this statement is relevant only to the obstruction charge. Indeed, it has little probative value other than to "dirty up" Lang in front of the jury. Fed. R. Evid. 403; 404(a). It is no secret that tax cheats are unpopular with taxpayers, a fact that has the potential to stir up the unfair prejudice spoken of by Rule 403.

Even if this testimony should have been excluded under Rule 403, its admission was harmless error. Lang has not shown us that "it is more probable than not that the error materially

affected the verdict." *Pritchett*, 749 F.3d at 432–33. Perhaps the most telling fact on this point is that the jury was remarkably precise when it convicted Lang. Of the six drug-involved-premises counts, the jury only convicted her on five. Similarly, the jury convicted Lang on only fourteen of the twenty-one structuring counts. We have held in other contexts that acquittal on the relevant charges indicates a lack of unfair passion in deliberations. *See, e.g.*, *United States v. Throneburg*, 921 F.2d 654, 658 (6th Cir. 1990); *United States v. Ferguson*, 385 F. App'x 518 (6th Cir. 2010). Here, a jury enraged by evidence of tax evasion would be inclined to convict on all counts to express its disapproval of the defendant's greed. The fact that the jury decided the case with precision is strong evidence that the jurors set aside any irrational impulses and decided the case based on the evidence presented, as they were required to do. We therefore find no reversible error in admitting Agent Lemons's testimony. Thus, we need not—and do not—express any opinion on whether Count 91 was constitutionally defective.

**B**

Next, Lang makes two arguments aimed at excluding the government's expert witness, Dr. Kloth. First, she argues that the district court should have held a *Daubert* hearing on the reliability of Dr. Kloth's methods, contending that he failed to review crucial evidence—specifically, Primary's electronic medical records ("EMRs"). Second, she contends that the district court erred in refusing to strike Dr. Kloth's testimony when confronted with the EMRs. Both objections are without merit.

*Daubert* requires that expert testimony be "not only relevant, but reliable." *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 589–90 (1993). To that end, the district court is required to act as a gatekeeper, drawing the line between junk science on one hand and legitimate methods on the other. *Id.* Because the district judge is in the best position to make reliability

determinations, we will only reverse for an abuse of discretion. *See Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 915–16, 919 (6th Cir. 2009). De novo review applies "only where the district court excludes expert testimony on the basis of an incomplete record, or after conducting nothing more than a perfunctory review." *Id.* at 915. Forfeited evidentiary objections are reviewed for plain error. *United States v. Poulsen*, 655 F.3d 492, 510 n.6 (6th Cir. 2011).

**1**

Lang argues first that the district court denied her *Daubert* motion based on an incomplete record. But this argument was forfeited because Lang never asserted below that the record was incomplete. *See Vance v. Wade*, 546 F.3d 774, 781 (6th Cir. 2006). The district court received not one, but two sets of *Daubert* motions on Dr. Kloth's testimony. It also received Dr. Kloth's expert reports. Nowhere in Lang's pretrial briefing or motions did she mention the EMRs she claims were necessary to a full record. Instead, she made vague complaints about the chain of custody and scientific sampling. Indeed, the first time Lang mentioned EMRs was in her motion to strike, after Dr. Kloth testified and long after the appropriate time for a *Daubert* hearing had passed. At least in the context of a motion for a *Daubert* hearing, Lang forfeited her right to have the EMRs considered as part of the gatekeeping inquiry by failing to specify them in her motion.

Lang's second argument meets a similar fate. She contends that the court engaged in a "perfunctory review" of the record by not addressing her "objection related to the incomplete patient files." But Lang never raised the EMR objection specifically in her motion, and so she can hardly complain that the court's review was perfunctory on this issue. The district court was not obligated to do Lang's work for her. Therefore, Lang has forfeited this argument as well.

Lang's counsel maintained at oral argument that he did actually identify this issue in his initial *Daubert* motion. The Court then read the relevant pages of the motion on the record for clarity. The crucial parts of the motion stated:

> [T]here is nothing to suggest that the patient files at the time law enforcement first obtained them, were the same patient files used by [the clinics] at the time when they were prescribing prescriptions to their patients. These patient files appear to have been stored, moved, and kept by a variety of different individuals over several months. The files appear to have traveled over state lines and appear to have several custodians at certain times and no custodian at other times. The chain of custody of these files is certainly at issue and calls into question the credibility of the files themselves.

R. 246, Second Mot. for *Daubert* Hr'g, PID 1147–48. The quoted language asserts only two things: (1) that law enforcement might not have obtained the *correct* files; and (2) that the content of the files might be *inaccurate* because of their dubious chain of custody. But this is clearly *not* an objection that the files were incomplete because they lacked EMRs. Counsel does not preserve an objection simply by making a vague, global objection that evidence *might* be imperfect.[2] *See* Fed. R. Evid. 403(a)(1)(B) ("a party, on the record, [must] . . . state[] the specific ground" for an objection). Otherwise, every objection to a piece of evidence, no matter how obscure, would preserve *all* arguments on that evidence for appellate review. This, of course, would defeat the whole reason for having a contemporaneous-objection rule—to let the district court address the argument in the first instance. Lang's gatekeeping arguments are forfeited.

In light of Lang's forfeiture, plain-error review applies to both of her gatekeeping arguments. Expert testimony on whether prescriptions are medically appropriate has long been the norm in controlled-substance prosecutions. *See United States v. Word*, 806 F.2d 658, 662–64 (6th Cir. 1986); *United States v. Hughes*, 895 F.2d 1135, 1144–45 (6th Cir. 1990). We have

---

[2] Counsel expressed frustration during oral argument that he "does not know how to make it any clearer." We are not so pessimistic about trial attorneys' ability to be precise. Simply saying, "Your honor, we have reason to believe that the clinics used electronic medical files not provided to the expert" would have sufficed to put the district judge on notice of the objection. The judge would, presumably, have then asked the government if this was true, and proceeded to resolve the issue—perhaps at a *Daubert* hearing.

acknowledged that—while not always necessary—it sometimes makes sense for the expert to provide an opinion on the files at issue in the case, rather than just stating generally appropriate practices. *Word*, 806 F.3d at 662–64. The district court found that Dr. Kloth reviewed the paper files of each patient on which he offered an opinion, and limited his testimony to those subjects. Absent a timely objection, there is no plain error in the district court's apparent belief that the paper files would be sufficient for a doctor to render a minimally reliable opinion.

The cases Lang cites do not change the outcome here. In these cases, we could not identify *any* factual findings on reliability in the record. *Mike's Train House, Inc. v. Lionel, LLC*, 472 F.3d 398, 407 (6th Cir. 2006) (concluding that the district court failed to "make any findings" on reliability); *United States v. Smithers*, 212 F.3d 306, 315 (6th Cir. 2000) (same); *Busch v. Dyno Nobel, Inc.*, 40 F. App'x 947, 961 (6th Cir. 2002) (reversing when the district court's ruling was "a mere recitation of the standard to be applied"). Here, the district court found that Dr. Kloth reviewed the patients' files and would give an opinion only on those patients. This is not plainly an abdication of the court's gatekeeping function, and so we uphold the court's decision not to hold a *Daubert* hearing.

**2**

Lang next argues that, in any event, the court abused its discretion in not striking Dr. Kloth's testimony once the EMRs came to light. We disagree. The *Daubert* standard is liberal, and it does not require expert opinions to be bulletproof. *Daubert*, 509 U.S. at 596. Instead, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* Thus, as in all cases, a jury is free to disbelieve expert testimony that it finds to be flawed. *Id.*; *see also United States v. Conatser*, 514 F.3d 508, 518–19 (6th Cir.

2008). The district court is also free to take the issue from the jury if it finds that no reasonable juror would be able to credit the testimony. *Daubert*, 509 U.S. at 596. We review reliability findings for an abuse of discretion. *Ky. Speedway*, 588 F.3d at 919. An abuse of discretion only exists if this court is "left with a definite and firm conviction that [the district court] committed a clear error of judgment." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528 (6th Cir. 2008) (quoting *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 781 (6th Cir. 2002)).

We first address some of the cases Lang cites in support of her insufficient-data claim. She correctly points out that "[a] district court is not required to admit expert testimony 'that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 254 (6th Cir. 2001) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). However, she overlooks the discretionary nature of this standard—what a district court *may* do and what it *must* do are two different things. For this reason, none of the Sixth Circuit cases that Lang cites in favor of reversal are helpful. In every case, we found no abuse of discretion. *Ask Chems., LP v. Computer Packages, Inc.*, 593 F. App'x 506, 510–11 (6th Cir. 2014); *Jack Henry & Assoc. v. BSC, Inc.*, 487 F. App'x 246, 257 (6th Cir. 2012); *Coffey v. Dowley Mfg., Inc.*, 89 F. App'x 927, 931–32 (6th Cir. 2003); *Kolesar v. United Agri Prods., Inc.*, 246 F. App'x 977, 981 (6th Cir. 2007).

Since *Daubert*, we have only ordered a district judge to exclude expert testimony twice. *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 667–68 (6th Cir. 2010); *Mike's Train House*, 472 F.3d at 467. In both *Tamraz* and *Mike's Train House*, however, the primary concern was with the expert's methods, not the factual basis of his opinion. In *Mike's Train House*, we found the expert's testimony wanting because he conjured his methods from thin air and lacked the

basic technical knowledge that would render an opinion trustworthy. 472 F.3d at 407–08. In *Tamraz*, we reversed because the expert's opinion "was at most a working hypothesis, not admissible scientific 'knowledge.'" 620 F.3d at 670. Like a hunch, an untested and unvalidated hypothesis may be correct, but it cannot be *knowledge*, since it is not based on sufficient facts or data and is not the product of reliable methods. *Id.* While acknowledging that *Daubert* "does not require anything approaching absolute certainty," we reasoned that "so long as there is a line, some forms of testimony may cross it, and that happened here. [The expert]'s opinion contains not just one speculation, but a string of them . . . . At some point, the train becomes too long to pull and the couplings too weak to hold the cars together." *Id.* at 671–72.

Thus, the only times a district judge has abused its discretion by admitting an expert is when it turns a blind eye to methods that are quite obviously made up. To be sure, there could be other grounds on which a court would improperly admit an expert. But the lesson to be learned from *Tamraz* and *Mike's Train House* is that unless the expert is clearly relying on "alternative facts" to support his or her opinion, we will trust the district court's judgment. We alluded to this standard soon after *Daubert* was decided:

> Expert testimony is not inadmissible simply because it contradicts eyewitness testimony. Expert testimony, however, is inadmissible when the facts upon which the expert bases his testimony contradict the [physical] evidence . . . . Because the factual underpinnings of the expert's testimony are sound, his testimony is admissible. For plaintiffs to succeed on this issue, they would have had to present facts that plainly contradict the physical evidence . . . .

*Greenwell v. Boatwright*, 184 F.3d 492, 497–98 (6th Cir. 1999).

There is some merit to Lang's argument that an expert cannot "cherry-pick" only favorable data. As Judge Agee recently pointed out in a Fourth Circuit concurrence, cherry-picking data is just as bad as omitting it or making it up altogether. *EEOC v. Freeman*, 778 F.3d 463, 468–71 (4th Cir. 2015) (Agee, J., concurring) (citing *EEOC v. Kaplan Higher Educ. Corp.*,

748 F.3d 749 (6th Cir. 2014)). Although Rule 702 does not require an expert to consider *all* the facts and data available, it does require the factual basis of his opinion to be *sufficient.* Fed. R. Evid. 702. Consequently, an expert may not be permitted to testify to the jury when his opinion rests only on facts that "plainly contradict" undisputed evidence. *Greenwell*, 184 F.3d at 498. Therefore, the question is whether, in light of the record as a whole, we are firmly convinced that the record plainly contradicts Dr. Kloth's factual basis. *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 528. We are not convinced.

Lang focuses on the two patients that were only seen at Primary—Rasso and Easterly— and so we limit our analysis to those patients.[3] We start with Rasso. Dr. Kloth concluded that Rasso's paper file contained "inadequate documentation" to justify certain prescriptions. Lang protests that the EMRs contradict this finding because they included records of a physical examination and rationales for the prescriptions. Although this is strictly true, Dr. Kloth relied on a host of other facts when coming to his conclusion, and Lang offers no argument to explain how these facts were contradicted by the EMRs. Lang cannot exclude an expert's entire opinion by removing one brick from the wall. Evaluating the impact of this small discrepancy was properly placed in the hands of the jury.

Lang makes similar arguments about Easterly's records. As with Rasso, Dr. Kloth lamented the lack of patient history and medical documentation in the paper file. Lang again argues that the EMRs answer this question by recording the results of a physical examination of the patient. Again, this is true, but beside the point. Dr. Kloth's report relies on more than this one fact to support his conclusion, and Lang does not argue that the EMRs have an impact on any of those other facts. Based on these records, Lang has not shown that the district court

---

[3] Lang does not develop her argument regarding the other eight patients covered by the EMRs. These patients were also seen at Superior (which used paper records and no EMRs), and so Dr. Kloth's testimony about them is not subject to attack under this theory.

abused its discretion.  Dr. Kloth may have been unaware of some relevant data, but he was aware of enough data for his opinion to be sufficient under *Daubert*.  Lang was free to impeach Dr. Kloth, to introduce the EMRs as contrary evidence, and to argue the incompleteness to the jury. *Daubert*, 509 U.S. at 596.  In other words, she makes arguments about the weight of the evidence, rather than its admissibility.  The district court therefore did not abuse its discretion in denying the motion to strike.

## C

Lang raises three more evidentiary arguments on appeal.  She insists that the district court erred in: (1) excluding fourteen defense witnesses, (2) admitting various pieces of irrelevant or unfairly prejudicial evidence, and (3) failing to exclude inadmissible hearsay.  We review evidentiary rulings for an abuse of discretion.  *United States v. Adams*, 722 F.3d 788, 810 (6th Cir. 2013).  Lang has not established any reversible error.

## 1

At the beginning of her case-in-chief, Lang attempted to call fourteen medical providers from Superior, Primary, and Elite.  The government objected, protesting that it had not been given the required notice of expert testimony under Federal Rule of Criminal Procedure 16(b)(1)(C).  The defense responded by contending that these individuals were lay witnesses who are not subject to the disclosure requirements.  The court barred Lang from calling these witnesses, finding that they were experts and that Lang had not given the required notice.

This was not an abuse of discretion.  A lay witness may not give an opinion "based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701(c).  Although a doctor may properly be called as a lay witness to testify about facts and treatment, she may *not* testify about the connection between the two without being qualified

as an expert—in other words, she may not explain why treatment was medically necessary or appropriate. *See United States v. Volkman*, 797 F.3d 377, 388–90 (6th Cir. 2015); *United States v. Kirk*, 584 F.2d 773, 785 (6th Cir. 1978).

Lang's argument is perplexing in this regard. She argued below that these witnesses should be able to say "why a physician wrote a specific prescription on a specific day, [and] whether the doctor believed that the patient needed that prescription at the time." On appeal, Lang mirrors this argument, contending that the testimony was "highly relevant to the jury's consideration of whether prescriptions were legitimate," and complains that they were necessary to rebut Dr. Kloth's opinion that the prescriptions were illegitimate. But this is classic expert testimony. To opine on *why* a physician wrote a specific prescription and *why* the patient needed it takes specialized medical knowledge, and is therefore a medical judgment subject to Rule 702. *See Volkman*, 797 F.3d at 388–90. Lang's citation of *United States v. Wells* is not to the contrary. 211 F.3d 988 (6th Cir. 2000). *Wells* predates the amendment to Rule 701 prohibiting expert testimony by lay witnesses; more importantly, however, the doctors in *Wells* testified about facts, not causes, rationales, or medical justifications. *Id.* at 998. The district court did not abuse its discretion in finding that these witnesses were undisclosed experts.

The district court also did not abuse its discretion in barring Lang from presenting the witnesses. The court found that Lang's failure to disclose the witnesses was a tactical ambush, designed to circumvent Rule 702 and avoid revealing her witnesses to the other side. Considering Lang's consciousness of the witnesses' expert purpose, the timing of the ambush, Lang's ample opportunity to disclose the witnesses, and the length of the trial, the district court did not abuse its discretion in barring Lang from presenting these witnesses.

Lang's constitutional argument requires only brief treatment. Obviously, neither Rule 16 nor the district court's use of it can violate Lang's right to call witnesses and present a complete defense. *United States v. Blackwell*, 459 F.3d 739, 752 (6th Cir. 2006). But Lang's argument is foreclosed by *Taylor v. Illinois*, where the Supreme Court held that exclusion is one of the many proper sanctions a judge may impose for willful discovery violations. 484 U.S. 400, 410–16 (1988). As *Taylor* reasoned, a defendant's constitutional right to call witnesses in his favor does not include the right to ambush the government with them. *Id.* ("[O]ne cannot invoke the Sixth Amendment as a justification for presenting what might be a half-truth.") (quoting *United States v. Nobles*, 422 U.S. 225, 241 (1975)). The exclusion of the defense witnesses therefore did not violate the Constitution.

**2**

Next, Lang makes a mixture of relevance and unfair-prejudice objections. Under Rule 401, evidence is relevant "if it has any tendency to make a fact more or less probable than it would be without the evidence," and if "the fact is of consequence in determining the action." Fed. R. Evid. 401. This threshold is low, and evidence is relevant if it "advance[s] the ball" one inch. *Dortch v. Fowler*, 588 F.3d 396, 401 (6th Cir. 2009). Additionally, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . ." Fed. R. Evid. 403. Both rules strongly favor admissibility—the only problematic evidence is that which evokes *unfair* prejudice that *substantially outweighs* any material, probative value provided. *Id.* As one court has aptly described the standard:

> In this context, prejudice means more than simply damage to the opponent's cause. A party's case is always damaged by evidence that the facts are contrary to his contentions, but that cannot be grounds for exclusion. What is meant here is an undue tendency to move the tribunal to decide on an improper basis, commonly, though not always, an emotional one. In the pungent phrase of Judge

> Sloan . . . the party "is entitled to hit as hard as he can above, but not below, the belt."

*People v. Vasher*, 537 N.W.2d 168, 172 (Mich. 1995) (internal citations omitted).

Reversals on Rule 403 grounds are few and far between. Particularly when a district judge admits prejudicial evidence after performing the required balancing on the record, we have reversed for an abuse of discretion only once under the modern rules. *Adams*, 722 F.3d at 832. Here, Lang objects to three pieces of evidence: (1) questions about the overdose death of a patient, (2) a news article about a pain clinic in another city, and (3) a news article about Superior.

Lang attacks the overdose death first. In her defense, Lang called Patterson, a nurse at Primary. Patterson testified that her patients were "legitimate pain patients." On cross-examination, the government sought to ask Patterson about whether she knew if any of her patients had died from an overdose, and specifically whether she had heard that James Treadway (one of her patients) had died from an oxycodone–fluoxetine overdose shortly after Patterson prescribed oxycodone to him. The government did not pursue this subject during its case-in-chief.[4] The court admitted the evidence over Lang's objections, reasoning that since Patterson adamantly refused to follow Lang's direction, the questions would only prejudice the witness, not the defendant.

The district court was correct. Attacks on a witness's credibility are always relevant. *See Davis v. Alaska*, 415 U.S. 308, 316 (1974); *United States v. Moore*, 917 F.2d 215, 222 (6th Cir.

---

[4] Lang complains that, before trial, the government promised not to "introduc[e] evidence that [Lang was] responsible for [Treadway's] death," and that the government violated this promise. We are not convinced. Even assuming this amounted to a binding promise, the government did not break that promise. The government simply used evidence of the death to test *Patterson*'s credibility. Nowhere did the government attempt to attribute the death to Lang. It is well-established that the government has wide latitude in attacking the credibility of a witness by exposing reasons why he or she ought not to be believed, and Lang cites no authority for the position that these questions amounted to reversible error. *See, e.g.*, *United States v. Dexta*, 136 F. App'x 895, 906 (6th Cir. 2005); Fed. R. Evid. 611(b).

1990); Fed. R. Evid 611(b). Thus, good-faith questions about whether Patterson knew that her patient had died from an overdose soon after she prescribed a large dose of oxycodone to that patient were admissible to impeach Patterson's claim that her patients were legitimate. Furthermore, the district court did not abuse its discretion in refusing to exclude the questions under Rule 403. As the court noted, Patterson testified that she did not, and would not, have obeyed Lang even if Lang had attempted to direct her medical practice. The danger that the jury would exact vengeance on Lang was therefore minimal. We have affirmed the admission of similar lines of questioning because of the strong probative force of impeachment evidence. *See, e.g.*, *United States v. Dexta*, 136 F. App'x 895, 906–07 (6th Cir. 2005). The district court did not abuse its discretion.

Lang also challenges the court's decision to admit two news articles that agents discovered in her desk at Primary. One of those articles discussed a federal indictment against a pill mill in another city ("the Crossville Article"); the other involved allegations of suspicious activities at Superior ("the Superior Article"). Of the thirty-three defendants indicted in the Crossville case, twelve were patients at either Superior or Primary. The Superior Article chronicled citizen complaints about suspicious activity occurring at Superior, including customer statements that Superior handed out medicines "that normal doctors just won't give you." This article was published just before Superior closed.

These articles are quite obviously relevant. Lang contended below—and contends on appeal—that she was ignorant of any illegality at her clinics, particularly at Superior. These articles tend to rebut Lang's defense, or make it "less probable," by showing that she may have known of illegal conduct at her clinics. Fed. R. Evid. 401. This clears the low bar set by Rule 401. *Dortch v. Fowler*, 588 F.3d 396, 401 (6th Cir. 2009).

Nor are the articles unfairly prejudicial. To be sure, it is unfavorable to have drug investigators find these materials in your desk at a suspected pill mill. But this is not the kind of prejudice of which Rule 403 speaks. The rule only contemplates "evidence which tends to suggest a decision on an improper basis" or which "hit[s] . . . below[] the belt." *United States v. Talley*, 164 F.3d 989, 1000 (6th Cir. 1999) (quoting *United States v. Bonds*, 12 F.3d 540, 567 (6th Cir. 1995)); *Vasher*, 537 N.W.2d at 172. In contrast, these articles suggest a decision on a wholly proper basis—that Lang knew her clinic was a pill mill, but that she continued operating it anyway. It also does not resemble a strike below the belt. The district court therefore did not abuse its discretion in admitting the evidence.

**3**

Finally, Lang raises two hearsay objections. Her first argument—that the Superior Article was inadmissible hearsay—is meritless. A statement is not hearsay unless it is an out-of-court statement offered "to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c)(2). Out-of-court statements are frequently offered—and admitted—for other reasons, including to prove the listener's reaction to a statement. *Moore v. City of Memphis*, 853 F.3d 866, 871 (6th Cir. 2017). That is exactly what the government did here. The article was offered to show that that Lang kept it in her desk, regardless of whether the accusations were true. Lang's act of retaining the article has a strong tendency to show that she was aware of potential misdeeds at the clinic. *See United States v. Crosgrove*, 637 F.3d 646, 657–58 (6th Cir. 2011). The court did not abuse its discretion in admitting the article.

Second, Lang argues that the court should not have admitted an alleged co-conspirator statement under Rule 801(d)(2)(E). Specifically, Lang disputes the admission of a document, found in her desk, titled "Chronology of Business Activities for Barbara Lang." In order to be

admissible as a co-conspirator statement, the government must show by a preponderance of the evidence that a conspiracy existed, that the defendant was part of that conspiracy, and that the offered statement was made by a co-conspirator in furtherance of the conspiracy. *United States v. Young*, 553 F.3d 1035, 1045 (6th Cir. 2009). We review factual findings on this subject for clear error. *Id.* Lang only takes issue with the last requirement—that the statements were made by a co-conspirator in furtherance of the conspiracy.

Lang has shown no clear error. The district court found that even though the precise author of the statement was unknown, the document was clearly prepared for Primary, Lang's alleged corporate alter ego. The court observed further that the context of the statement indicated that it must have been written by someone in the conspiracy. The chronology itself was an unapologetic defense of Superior's business model and of Primary's adoption of that model. The district court did not commit clear error in finding that *one of the conspirators* wrote the statement, even if it could not identify which one. *See United States v. Martinez*, 430 F.3d 317, 326 (6th Cir. 2005).

There is also no clear error in finding that the statement was made in furtherance of the conspiracy. A statement qualifies under Rule 801(d)(2)(E) "if it was intended to promote conspiratorial objectives; it need not actually further the conspiracy." *Martinez*, 430 F.3d at 327 (quoting *United States v. Carter*, 14 F.3d 1150, 1155 (6th Cir. 1994)). Here, the chronology is remarkably favorable to Lang, and the district court did not commit clear error by finding that its purpose was likely to further the conspiracy's objective—to continue making money.

For these reasons, Lang has not identified any error in the court's evidentiary rulings.

**D**

Lang's next objection relates to an allegedly illegal search of Superior by an undercover DEA agent. After being interviewed by Superior for a nurse-practitioner job, Deane Peterson contacted DEA agents and told them that the clinic "made him feel uneasy." He asked if the agents would like him to accept the job in order to feed them information, and the agents agreed. Peterson accepted the job and provided information, but eventually gave in to temptation and started prescribing illegally himself, despite strong rebukes by the DEA. Eventually, undercover agent Mark Delaney posed as a patient to observe Superior's activity. On one visit, the clinic admitted Delaney to see a provider, who happened to be Peterson. Peterson did not know the true identity of his "patient". Delaney's observations were then used to incriminate Lang.

Lang contends that Delaney's entry into the exam room violated the Fourth Amendment. Specifically, she contends that Peterson was a government agent, and therefore that his act of admitting Delaney into the exam room caused an unconstitutional search. The government responds by arguing that Peterson was only an *informant*, and therefore generally incapable of being a state actor under the Fourth Amendment. *See Hiser v. City of Bowling Green*, 42 F.3d 382, 383–84 (6th Cir. 1994). The district court agreed with the government and denied the motion. This was proper, but for reasons different than those given by the district court.

We review Fourth Amendment constitutional questions de novo. *United States v. Hardin*, 539 F.3d 404, 416 (6th Cir. 2008). The Fourth Amendment protects both businesses and private residences. *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 311 (1978). However, a defendant has no reasonable expectation of privacy in places of a commercial building where the public is invited to transact business. *Maryland v. Macon*, 472 U.S. 463, 469 (1985). On this point, we agree with the district court that the only colorable Fourth Amendment claim here relates to

Delaney's entry into Peterson's examination room, since the waiting room and lobby of a medical clinic are open to the public.

Lang argues that the search was illegal because Peterson was a government agent. Her arguments rest on the assumption that if a defendant's employee is secretly a government agent (as opposed to a mere informant), the employee's consent is constitutionally ineffective. However, none of our cases adopt this view or even ask the agent–informant question—because it's the wrong question to ask. Lang applies the government-agent test through a misunderstanding of the private-search doctrine. Ordinary burglars or nosy roommates cannot violate the Fourth Amendment, no matter how invasive they become. *See Coolidge v. New Hampshire*, 403 U.S. 443, 487 (1971); *United States v. Bowers*, 594 F.3d 522, 525–26 (6th Cir. 2010). The private-search doctrine was imposed to prevent the police from covertly deputizing private citizens to break the law, thereby circumventing the state-action requirement and the Fourth Amendment's strictures. *Id.* Thus, when an ordinary citizen invades another's privacy at the government's request and for the government's benefit, he becomes a *government agent*, and the courts treat him as one. *United States v. Boumelhem*, 339 F.3d 414, 425 (6th Cir. 2003); *Hardin*, 539 F.3d at 418–19.

This was what happened in *Hardin*, the one case Lang cites in support of her position. *Hardin* involved police officers who suspected that the defendant was staying in his girlfriend's apartment. *Id.* at 407–08. In order to obtain probable cause for a search warrant, they constructed a ruse where the landlord would gain entry to the apartment by lying about a maintenance issue, and then confirm the defendant's presence for the officers. *Id.* We concluded that the landlord was an agent of the government when he performed the unlawful search. *Id.* at 418–19. We reached this conclusion by observing that (1) the government

instigated the ruse, (2) the government knew about the illegal search, and (3) the landlord's intent was aligned with the government's interests. *Id.*

Two important distinctions show that *Hardin* does not apply here. First, Peterson *did not conduct a search*. Indeed, Lang objects only to *Delaney's* allegedly illegal search of the exam room. But in every case where we have found a violation of the private-search doctrine, the private person at issue had always conducted a search on the government's behalf. *See, e.g.*, *United States v. Lichtenberger*, 786 F.3d 478, 484–85 (6th Cir. 2015) (search of a boyfriend's computer); *United States v. Booker*, 728 F.3d 535, 545 (6th Cir. 2015) (doctor's intubation and physical examination of suspect); *Hardin*, 539 F.3d at 418–19. Second, Peterson violated no law or rule that would require private-search analysis anyway. Lang does not contest that Peterson had the authority to treat patients in the exam room. In contrast, the landlord in *Hardin* lied about his authority to enter—something that is beyond the power of the police and laypersons alike. *E.g.*, *United States v. Shaw*, 707 F.3d 666, 669 (6th Cir. 2013) (holding that police may not "tell an occupant that they have a warrant to make an arrest at a given address when they do not"). The private-search doctrine is therefore inapplicable to this case.

Instead, this Fourth Amendment issue is governed by the Supreme Court's consent jurisprudence. The voluntary consent of a person authorized to give it removes the need for a warrant. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973); *United States v. Matlock*, 415 U.S. 164, 171 (1974). Police may also rely on a third party's apparent authority to give consent, so long as that reliance is reasonable. *Illinois v. Rodriguez*, 497 U.S. 177, 188–89 (1990). Furthermore—in contrast to lies about authority—an undercover officer's misrepresentation of her *identity* does not invalidate consent. *United States v. Pollard*, 215 F.3d 643, 648 (6th Cir.

2000); *United States v. Baldwin*, 621 F.2d 251, 252–53 (6th Cir. 1980); *Shaw*, 707 F.3d at 669 (6th Cir. 2013).

Further, the Constitution is not an insurance policy against broken trust. "The Fourth Amendment . . . does not protect wrongdoers from misplaced confidence in their associates." *Baldwin*, 621 F.2d at 252; *see also Hoffa v. United States*, 385 U.S. 293, 301 (1966) ("Partin [an informant] was in the suite by invitation, and every conversation which he heard was either directed to him or knowingly carried on in his presence. [Hoffa], in a word, was not relying on the security of the hotel room; he was relying in his misplaced confidence that Partin would not reveal his wrongdoing."); *United States v. King*, 55 F.3d 1193, 1196 (6th Cir. 1995) ("It is well settled that when an individual reveals private information to another, he assumes the risk that his confidant will reveal that information to the authorities, and if that occurs the Fourth Amendment does not prohibit governmental use of that information.") (quoting *United States v. Jacobsen*, 466 U.S. 109, 117 (1984)). We have therefore rejected complaints that a defendant "never consented to the presence of a 'police spy' in his home." *Baldwin*, 621 F.2d at 252. This is consistent with the Supreme Court's view that that voluntariness does not always require full disclosure by the police. *Ohio v. Robinette*, 519 U.S. 33, 39–40 (1996); *Moran v. Burbine*, 475 U.S. 412, 422 (1986) ("[W]e have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest . . . .").

Thus, the true question here is whether Peterson had actual or apparent authority to admit Delaney to the exam room. The parties do not dispute that he did. Lang's only complaint is that he used that authority to let Delaney enter. But this is not different from a case where the defendant finds out, to his chagrin, that he has unwittingly invited an undercover officer into his home. *Baldwin*, 621 F.2d at 252. Although we have not specifically reached this holding with

regard to a police informant, the other three circuits to confront this issue have found no Fourth Amendment violation. *See United States v. Spotted Elk*, 548 F.3d 641 (8th Cir. 2008) (apparent authority); *United States v. Apperson*, 441 F.3d 1162, 1186–87 (10th Cir. 2006); *Wang v. United States*, 947 F.2d 1400, 1403 (9th Cir. 1991). Absent some lack of authority by his criminal comrades, a defendant may not make out a Fourth Amendment violation merely by crying, "*Et tu, Brute!*" The district court therefore properly denied Lang's motion to suppress.

**E**

Lang makes a feeble attempt to assert cumulative error under *United States v. Adams*, 722 F.3d 788, 832 (6th Cir. 2013). Since the only possible error was the admission of Agent Lemons's colloquy about prejudice to the IRS, there is no reason to address this question. There is no cumulative error.

**F**

Lang argues next that the evidence was insufficient to convict her of the conspiracy counts and the drug-involved-premises counts. Although the standard of review is de novo, we will only vacate a conviction on these grounds if, after viewing the evidence in the light most favorable to the prosecution, "[No] rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Pritchett*, 749 F.3d 417, 430–31 (6th Cir. 2014) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Lang has not met that requirement here.

**1**

Lang first challenges her two drug-conspiracy convictions. *See* 21 U.S.C. § 846. To convict on a § 846 charge, the government must prove: "(1) an agreement to violate drug laws; (2) knowledge of and intent to join the conspiracy; and (3) participation in the conspiracy."

*United States v. Gunter*, 551 F.3d 472, 482 (6th Cir. 2009). Lang contends that the evidence was insufficient to support a finding of (1) intent to join a drug conspiracy at Superior, and (2) an agreement to violate the drug laws at Primary. Her arguments are meritless.

Lang concedes that the evidence was sufficient to prove the existence of a conspiracy at Superior. But once a conspiracy is proven, "the prosecution need only produce slight evidence to implicate the defendant." *United States v. Sturman*, 951 F.2d 1466, 1474 (6th Cir. 1991). Moreover, this slight evidence may be provided by circumstantial proof. *United States v. Sadler*, 750 F.3d 585, 593 (6th Cir. 2014). Although a conviction cannot stand when the evidence only establishes "a climate of activity that reeks of *something* foul," the evidence is sufficient when it, so to speak, identifies the source of the odor. *See United States v. Morrison*, 220 F. App'x 389, 393 (6th Cir. 2007) (quoting *United States v. Wieschenberg*, 604 F.2d 326, 332 (5th Cir. 1979) (emphasis added)).

Lang argues that she was an innocent bystander who neither knew about nor intended to join the drug conspiracy at Superior. A reasonable jury could have found otherwise. Lang was at the clinic almost on a daily basis, and the jury heard an avalanche of testimony that Superior was handing out pills like candy at a carnival. *See, e.g.*, R. 682, Farinash Testimony, PID 8794 ("It was so blatant to me what was going on there"); *id.*, Williams Testimony, PID 8821–24 (describing Superior's patients as "zombies"); *id.*, Dr. Miller Testimony, PID 8768 ("[E]verything there just made me feel very dirty, in a very dirty place. And it was not anything like I would expect in a doctor's office. . . . I thought it was a pill mill."); R. 683, Sampson Testimony, PID 8870–71 ("They didn't look like your average customers. They looked more like they w[ere] drug users. . . . They had sores on their faces, and they had sores on their hands

and arms. . . . it didn't look right . . . . [I]t put me in the mind of a drug house."); R. 685, Delaney Testimony, PID 9263 (describing the patients as "strung out").

Additionally, the jury heard testimony that Lang knew drug dealers were bringing their buyers to Superior. When clinic staff asked one of the dealers (John Goss) "if [he was] the law," one of the patients laughed and said, "Probably anything but the law." Lang was present for this colloquy. Lang later wrote a note to herself that Goss had done a "[t]en-year federal stint" for drug crimes. Nevertheless, Lang maintained a close relationship with Goss, where Goss would call ahead and ask Lang to clear space for his buyers, and Lang would do so. When federal agents asked Lang if she knew Goss or had ever talked to him, Lang said she knew he was a dealer, but that she "didn't want to have anything to do with him," had never spoken to him, and would run him off her property if she found him. This was not true—Lang even had Goss's cell phone number, and DEA agents had recorded calls between the two of them.

This is only a sampling of the evidence against Lang on this issue. Contrary to Lang's contentions, the government did more than merely present evidence that Lang knew about general wrongdoing. A conspiracy conviction requires proof of knowledge and intent, but it does not require juries to ignore their common sense. *Thompson v. Parker*, 867 F.3d 641, 647–48 (6th Cir. 2017). Here, it was clear to even casual observers that Superior was a pill mill. Lang was a part owner of Superior and was present on a regular basis. The jury could reasonably find, therefore, that Lang must have actually "[seen] the handwriting on the wall," just as others did, and knew she was running a pill mill.

Lang's citation of *United States v. Morrison* does not help her case. In *Morrison*, we vacated several drug convictions because the government presented no evidence that the defendant knew hidden contraband was cocaine, as opposed to some other illegal item. 220 F.

App'x at 395. In reaching this conclusion, the panel stated that "conjecture and surmise regarding what a defendant may have intended or known is insufficient to support a conviction." *Id.* (quoting *United States v. Coppin*, 1 F. App'x 283, 291 (6th Cir. 2001)). While this statement is conceptually true, it obscures the distinction between impermissible speculation and legitimate inference. Juries cannot read minds, and yet the criminal law often requires them to make factual findings about a defendant's knowledge or intent. To a certain extent, these findings are *always* based on "conjecture and surmise," particularly in drug-conspiracy cases. *Id.*; *United States v. Tocco*, 200 F.3d 401, 424 (6th Cir. 2000); *United States v. Green*, 548 F.2d 1261, 1266 (6th Cir. 1977). Thus, while jurors may speculate about what a defendant knew, such speculation must be based in *fact*, not on thin air.

This was the problem with the conviction in *Morrison*. In that case, the cocaine was hidden in the gas tank of the car, the parties never discussed the nature of the contraband, and the defendant was simply an intermediary between the "runners" and the ultimate purchaser. 220 F. App'x at 395–97. Thus, the jury was presented with no facts from which they could infer that the defendant knew the cargo was cocaine, as opposed to some other contraband. *Id.* Lang's case is fundamentally different. She knew Superior was prescribing controlled substances. The crucial issue here is whether she knew the prescriptions were illegitimate, and as stated above, the jury was presented with an ample factual basis from which they could infer that Lang knew the prescriptions were illegal. The evidence was therefore sufficient to support a conviction for conspiring to distribute illegal controlled substances from Superior.

Lang also challenges her second conspiracy conviction by arguing that the jury could not have found that there was a drug conspiracy at Primary. She is wrong. The government need not prove a formal agreement in conspiracy cases; instead, it carries its burden by showing at

least "a tacit or material understanding among the parties." *United States v. Warman*, 578 F.3d 320, 332 (6th Cir. 2009) (quoting *United States v. Pearce*, 912 F.2d 159, 161 (6th Cir. 1990)). Such an agreement may be proven by circumstantial evidence, including by the defendant's participation in a common plan. *Id.*

Unlike Superior, Lang concedes that she was the owner and operator of Primary. The jury heard testimony that soon after Primary opened, Lang called Goss—whom she knew to be a drug dealer—and asked him to bring his people to Primary. Lang also overruled her doctors' refusal to prescribe the pills that her customers wanted. And Primary suffered from the same addict-riddled clientele as Superior. (*See, e.g.*, R. 689, Goldberg Testimony, PID 9975–76 ("The only thing different was the owner.")). This evidence speaks for itself. A rational jury could have easily found that Lang was part of a drug conspiracy at Primary.

**2**

Next, Lang challenges her five convictions for maintaining a drug-involved premises. *See* 21 U.S.C. § 856(a)(1). To convict a defendant on these charges, the government must prove beyond a reasonable doubt that the defendant (1) knowingly (2) maintained any place, whether permanently or temporarily, (3) for the purpose of distributing a controlled substance. *United States v. Russell*, 595 F.3d 633, 644 (6th Cir. 2010). Lang disputes the maintaining element as to Superior, and the purpose element as to both Superior and Primary. Again, her arguments are without merit.

Lang argues first that she did not maintain Superior. But ownership or primary responsibility for a premises is not required by the word *maintained*. *See id.* Instead, the element is satisfied by "control, duration, acquisition of the site, renting or furnishing the site, repairing the site, supervising, protecting, supplying food to those at the site, [or maintaining]

continuity." *Id.* (quoting *United States v. Clavis*, 956 F.2d 1079, 1091 (11th Cir. 1992)). Under this standard, a reasonable jury could have convicted Lang of maintaining Superior. Lang was identified at various times as an owner or manager of Superior. She obtained Superior's business license and was active in paying its expenses. Although Blake was the manager, Lang worked at the clinic at least as much as Blake did. When Blake's attendance started to slip, Lang became even more engaged in the management of Superior—up to and including "seeing patients." This is more than enough to allow a rational jury to find that Lang helped maintain Superior.

Second, Lang contends that her purpose in maintaining the clinics was not to distribute drugs illegally. As shown above, however, the jury heard ample evidence to the contrary. Illegal distribution need not be a defendant's sole or primary purpose, as long as the illegal purpose is significant. *Sadler*, 750 F.3d at 592–93. Although Lang contends that her only significant role in operating Superior was running Bible studies, the evidence recounted above tells a different story. Lang complains that Primary was operated differently than Superior, and that some of Primary's employees sincerely believed that nothing illegal was happening there. This is beside the point. We will not reweigh the evidence or second-guess the jury's decision to disbelieve a witness. *Pritchett*, 749 F.3d at 431. So long as the government presented enough proof to allow a reasonable jury to convict, we will affirm. As described above, that is the case here. The evidence was sufficient to support a finding that Lang's purpose was to distribute drugs illegally. We therefore uphold all of Lang's convictions.

### III

Lang also raises several objections to her sentence. After a hearing, the district judge sentenced Lang to 3,360 months (280 years) in prison. The court arrived at this result by applying the Guidelines and by setting Lang's twenty-one convictions to run consecutively.

Lang argues that this sentence was procedurally unreasonable because the court miscalculated the quantity of drugs attributable to her. She argues that the sentence is substantively unreasonable because it is far higher than any sentence imposed in similar circumstances and is inappropriately long. Notwithstanding the abstract absurdity of the sentence here, it's practical effect was not unreasonable.

A

Lang's first argument is that her sentence is procedurally unreasonable. The thrust of her claim is that the district court's factual findings on drug quantity were not supported by a preponderance of the evidence. We are not persuaded.

The quantity of drugs attributable to the defendant is used to calculate the appropriate base offense level under the Guidelines. *United States v. Tucker*, 90 F.3d 1135, 1144 (6th Cir. 1996); USSG § 2D.1(c). Incorrectly calculating this number is a significant procedural error that requires resentencing. *United States v. Shields*, 664 F.3d 1040, 1043 (6th Cir. 2011). We review the district court's factual findings on drug quantity for clear error. *United States v. Walton*, 908 F.2d 1289, 1300–01 (6th Cir. 1990).

The district court found that Lang's base offense level was 38. To trigger a base offense level of 38 under the Guidelines for a drug crime, the court must find the defendant responsible for at least 13.4 kilograms[5] of oxycodone. *See* USSG § 2D.1(c), cmt. 8(A), (D). The district court found—and Lang does not appear to dispute—that her clinics prescribed around 50 kilograms of oxycodone. Lang simply protests that not all these prescriptions were illegal,

---

[5] Oxycodone is not listed in § 2D1.1's *Drug Quantity Table*. In such cases, the Guidelines direct the court to use the *Drug Equivalency Tables* to convert the controlled substance at issue to an equivalent amount of marijuana. USSG § 2D1.1(c), cmt. 8(A). The quantity of marijuana should then be used to find the appropriate base offense level. *Id.* A person who possess 90,000 kilograms or more of marijuana is subject to the maximum base offense level of 38. *Id.* § 2D1.1(c). One kilogram of oxycodone is equal to 6,700 kilograms of marijuana. *Id.*, cmt. 8(D). Thus, to trigger the base offense level of 38 for an oxycodone-based crime, the defendant must be held responsible for: $\frac{90,000\ kg\ marijuana}{6,700\ kg\ marijuana} = 13.4\ kg\ oxycodone$. *Id.*

and even less could be attributed to her. But the district court heard and credited testimony from the trial that at least half the prescriptions written by the clinics were illegal. Thus, even if Lang is correct that the court lacked a factual basis for finding that her clinics distributed 50 kilograms of illegal oxycodone, there *was* a basis for finding that 25 kilograms were illegal, more than enough to trigger level 38 under the Guidelines.

Lang also complains that even if this is correct, it is unfair to attribute all 25 kilograms to her. It is true that a court cannot automatically attribute all the drugs distributed by a conspiracy to all defendants. *Tucker*, 90 F.3d at 1144. Instead, a defendant must be sentenced based on "the drug quantities for which he is directly involved, and any quantity that is a reasonably foreseeable consequence of the conspiracy." *United States v. Anderson*, 333 F. App'x 17, 25 (6th Cir. 2009). Although the district court's findings on this issue are less specific than perhaps they should be, there is no serious question that at least 13.4 kilograms could be attributed to Lang. As the court noted later, Lang "exercise[d] a leadership position in th[e] conspiracy." There is no clear error in finding a leader of a conspiracy responsible for around half the illegal drugs distributed by the conspiracy. Lang has therefore not shown any procedural unreasonableness that requires resentencing.

**B**

Lang next objects to her 3,360-month sentence. As her counsel noted at sentencing, a hypothetically immortal prisoner, fresh out of jail in 2015 on an identical sentence, would have been originally incarcerated in the year Paul Revere was born. In the abstract sense, Lang's objection is understandable. Heaping several lifetimes of punishment on her serves no real purpose: She only has one life to give.

But the Guidelines do not deal in abstractions. Neither do the courts. At a certain point, large numbers become meaningless placeholders for one practical reality: Lang will spend the rest of her mortal life in jail. A 3,360 month sentence—like a 750-year or 10,000-year sentence—might be "uncommonly silly," but it makes no practical difference. *Cf. Crowley Cutlery Co. v. United States*, 849 F.2d 273, 276 (7th Cir. 1988); *United States v. Betcher*, 534 F.3d 820, 827–28 (8th Cir. 2008) ("Betcher's sentence—for practical purposes—is a life sentence, and that is how we view it. . . . The absurdity of a 750 year sentence, or even a 10,000 year sentence, should not detract from the gravity of Betcher's crimes."). Thus, the real question here is whether Lang can show that an effective life sentence is an abuse of discretion. She cannot.

Lang's ultimate offense level was 48, well above the highest level contemplated by the Guidelines. USSG § 5A. At that level, the Guidelines recommendation is life imprisonment. USSG § 5A, cmt. 2. A sentence within the Guidelines range is presumptively reasonable, and the defendant bears the burden of rebutting that presumption. *United States v. Ruiz*, 777 F.3d 315, 323 (6th Cir. 2015). The district court found that Lang was one of the leaders of a "massive conspiracy" that injected "huge quantities" of illegal pills into the community. It also noted the serious epidemic of prescription drug abuse in the region and in the United States.

Additionally, Lang was the only defendant who refused to plead guilty and who required a trial to establish guilt. And even after she was convicted, Lang never clearly acknowledged her personal culpability. R. 711, Sent. Hr'g, PID 12972–74 ("I have tried my best to do the right thing. I always want to do the right thing, and I've always thought I was doing the right thing . . . I do not know all the ins and the outs of the laws, and have been surprised at all the laws that I've uncovered since all this has happened. It would be nice . . . if the public would

have known them."); *id.* at 12980–81 ("I've started doing some studying on all this conspiracy thing. When I looked up in *Webster*, to conspire means 'to plan together in secret to commit a wrongful act.' Your Honor, I've never met anybody in secret, never discussed anything with anybody.").

Lang also argues that a 3,360-month sentence is disproportionate to other sentences handed out for similar offenses across the country. *See United States v. Thompson*, 218 F. App'x 413, 416–17 (6th Cir. 2007); 18 U.S.C. § 3553(a)(6). The highest comparable sentence either party has identified was an 830-month sentence affirmed in *United States v. Kincaid.* 631 F. App'x 276, 279 (6th Cir. 2015). But the sentence in *Kincaid* was also an effective life sentence. *Id.* at 285. Thus, any numerical disparity aside, the *Kincaid* sentence is identical to Lang's. A numerical disparity between sentences cannot be a basis for declaring a sentence unreasonable when the practical effect of the sentence is the same in both cases.

In light of the evidence heard by the court, an effective life sentence was not an abuse of discretion. The court acknowledged the need for the sentence to reflect the seriousness of the crime and to promote due respect for the law. 18 U.S.C. § 3553(a)(2). An effective life sentence is not an inappropriate response to a drug conspiracy of this size and a defendant who remains in deep denial of her personal culpability. The court therefore did not abuse its discretion in sentencing Lang.

**IV**

There is no reversible error in Lang's convictions or in her sentence. We **AFFIRM** the judgment of the district court.